PENZATO, J.
The defendant, Rodrick D. Coleman, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty. After a trial by jury, the defendant was found guilty as charged. The trial court denied the defendant's motion for post-verdict judgment of acquittal and motion for new trial. The defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, assigning error in a counseled brief to the trial court's denial of his motion for post-verdict judgment of acquittal and the sufficiency of the evidence. The defendant also filed a pro se brief wherein he argues that he was prejudiced and denied a fair trial by the State's leading question on direct examination of a witness. For the following *875 reasons, we affirm the conviction and sentence.
STATEMENT OF FACTS
On July 20, 2008, officers of the East Baton Rouge Parish Sheriff's Office (EBRPSO) were dispatched to the scene of a shooting in the Manson Drive and East Azalea Park Drive area of Baton Rouge. After arriving at 1076 Manson Drive, Officer Samuel Wilson, Jr. secured the scene and observed the deceased victim, Anthony Hall, lying on the ground with apparent gunshot wounds.[2] The police further recovered a pistol[3] located underneath the victim's body, and a clear plastic baggie of suspected marijuana located next to the passenger-rear tire of a vehicle near the victim's body. The officers collected evidence, photographed the scene at Manson Drive, and observed a blood trail within the alleyway leading to the parking lot at 14150 East Azalea Park Drive, where a blood-spattered vehicle, a white T-shirt, and a bicycle were discovered. However, the police did not recover any shell casings from the scene. The police also canvassed the area and spoke to many potential witnesses. David Brown, one of the Manson Drive residents, was interviewed by EBRPSO Detective Sonya Harden, and Brown subsequently testified at the trial. Brown went to his door immediately after hearing several gunshots. At that point, as Brown looked out of his window, a male wearing a white top and dark pants stated, "This is Pakistan," just before entering the backseat of a turquoise green four-door vehicle. The vehicle was driven away from the scene by a female. Detective Todd Morris, the captain of the EBRPSO Homicide Division (Violent Crimes Unit), interviewed another area resident, Bobby Singleton. Singleton, however, stated that he had no knowledge of the shooting, and that he was inside when the shots were fired.
The next morning, Detective Morris was contacted by an anonymous caller who identified the shooter as "Dre." Based on information received from anonymous tips[4] and other potential witnesses, the police learned that Dre was a nickname for the defendant, that the defendant and his girlfriend, Rae Michelle Carrell (often referred to as "Rae Michelle"), were visiting her cousin, Shalena London, at London's residence on Azalea Park Avenue on the night in question, and that the defendant left the scene in London's green Chevrolet Cavalier immediately after the shooting. Further, despite his prior indication that he did not see the shooting, Singleton was identified as an eyewitness to the shooting. Thus, on July 25, 2008, the police went to Singleton's home and he agreed to a recorded interview by Detective Morris.
At the time of the offense, Singleton lived with his mother, Linda Taylor, on Azalea Park Avenue, which is near East Azalea Park Drive where the shooting occurred. Singleton, who became emotional and began crying during the interview, indicated that he had known the victim since third grade and that the victim was murdered on the eve of his twenty-third birthday.[5] Singleton was initially *876 standing outside in front of his brother's apartment with Dre (the defendant) and Rae Michelle. After the defendant and Rae Michelle went inside, Singleton saw the victim riding his bicycle towards him. Singleton, an admitted drug dealer, knew the victim's birthday was hours away and anticipated a drug sale at that point. As the victim approached, he asked Singleton if he could purchase some marijuana to celebrate, further stating that he had four dollars at the time. Considering the victim's upcoming birthday, Singleton agreed to make the exchange for two baggies and led the victim to the alleyway. As the victim placed the four dollars in Singleton's hand, the defendant "crept up" from behind before Singleton could give the victim the marijuana, and began shooting at the victim. The victim pushed Singleton just before attempting to flee. The defendant kept shooting at the victim, ultimately striking him.
The defendant testified at the trial and admitted that he, his girlfriend Rae Michelle, and her two children were at London's residence that night and that he was outside with Rae Michelle at the time of the shooting. He further admitted that he was wearing a long white T-shirt and dark blue jean shorts that night. According to the defendant, he and Rae Michelle were walking when they heard very loud gunshots that were seemingly fired "real, real close" to their standpoint. The defendant confirmed that he left the scene in a green vehicle, stating that after he secured Rae Michelle, they ran to London's apartment, woke up the children, and asked London to take them home. He confirmed that he knew Singleton, but denied knowing or shooting the victim, or having a gun that night.
SUFFICIENCY OF THE EVIDENCE
In a combined argument for the assignments of error, the defendant claims that there was no evidence the jury could have relied on to corroborate the facts asserted in supposed prior statements used to impeach Taylor and Singleton. The defendant notes that both witnesses testified that they did not recall making the pretrial out-of-court statements identifying the defendant, and neither witness was able to identify the defendant as the perpetrator in court. Thus, the defendant maintains that the prior statements cannot be relied on in considering whether the evidence is sufficient to support the conviction. The defendant argues that the jury should not have considered the substance of those statements as proof of the matter asserted. The defendant concludes that the balance of the evidence fails to rise to the level of proof beyond a reasonable doubt that the defendant was the shooter and guilty of second degree murder.
When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana , 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proven *877 beyond a reasonable doubt. State v. Hearold , 603 So.2d 731, 734 (La. 1992).
When the entirety of the evidence is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion of trial error issues as to that crime would be pure dicta since those issues are moot. However, when the entirety of the evidence is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the other assignments of error to determine whether the accused is entitled to a new trial. If the reviewing court determines that there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused will be granted a new trial, but is not entitled to an acquittal. Id.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson , requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B) ; State v. Ordodi , 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. La. R.S. 15:438 ; State v. Wright , 98-0601 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 486, writs denied , 99-0802 (La. 10/29/99), 748 So.2d 1157, 2000-0895 (La. 11/17/00), 773 So.2d 732. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville , 448 So.2d 676, 680 (La. 1984).
Louisiana Revised Statute 14:30.1(A)(1) defines second degree murder, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon , 95-0625 (La. App. 1st Cir. 5/10/96), 673 So.2d 663, 665, writ denied , 96-1411 (La. 12/6/96), 684 So.2d 923. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Delco , 2006-0504 (La. App. 1st Cir. 9/15/06), 943 So.2d 1143, 1146, writ denied , 2006-2636 (La. 8/15/07), 961 So.2d 1160.
The State bears the burden of proving the elements of the offense, along with the burden to prove the identity of the defendant as the perpetrator. State v. Draughn , 2005-1825 (La. 1/17/07), 950 So.2d 583, 593, cert. denied , 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the *878 State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. State v. Weary , 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, cert. denied , 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006), quoting State v. Neal , 2000-0674 (La. 6/29/01), 796 So.2d 649, 658, cert. denied , 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson , 459 So.2d 31, 38 (La. App. 1st Cir. 1984). Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Marshall , 2004-3139 (La. 11/29/06), 943 So.2d 362, 369, cert. denied , 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007). It is the fact finder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. State v. Hughes , 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051.
Due to the presence of fresh blood at 1076 Manson Drive where the victim was lying, blood on the vehicle in the parking lot at 14150 East Azalea Park Drive, and a shoeprint impression in the alleyway, the officers on the scene concluded that the victim ran from 14150 East Azalea Park Drive to where his body was discovered at Manson Drive. During their on-the-scene canvas that night, most of the bystanders who were questioned, including Singleton and Taylor, denied seeing anything relating to the shooting. However, the police received information indicating that the victim previously had an altercation with the defendant on Goodwood Boulevard in Baton Rouge. The police further received information prompting them to contact Shalena London the day after the shooting.
London, who testified at the trial, lived on Azalea Park Avenue at the time of the offense. London confirmed that "Dre" (the defendant) and Rae Michelle planned to sleep at her house that night. She further confirmed that the defendant was not in the apartment when she was awakened by gunfire. She went to her front door and stepped outside, but went back inside as one of her neighbors warned her to go inside and close her door. A few minutes later, Rae Michelle and the defendant knocked on London's door, indicating that they were ready to go home. She noted that the defendant was upset and irritated, adding, "He said that somebody was after him, been shooting at him."
Rae Michelle and the defendant proceeded downstairs as London retrieved her car keys. As London proceeded to the stairway, she heard the defendant arguing with someone she was unable to see. London confirmed that Rae Michelle was yelling at the time, telling the defendant to get into the car. London also saw "Ms. Linda" (Linda Taylor) outside at the time. During the ride home, the defendant apologized to London. London specifically testified as follows, "he calls me 'Lyn'. He said, 'Lyn, I'm sorry this happened over here by your house.' And he just said he was sorry." London confirmed that the defendant was wearing a white T-shirt and blue-jean shorts that night. London testified that she did not see the defendant with a gun.
Though Taylor had initially indicated that she did not see anything, she was re-interviewed on March 13, 2009, after her son Singleton's recorded interview. Taylor testified at the trial that she was asleep in bed when she heard the gunshots. After she opened her front door, a neighbor told her to stay inside. Thus, she closed her *879 door and waited before going outside. Minutes later, Taylor's daughter Yolanda Lewis[6] went with Singleton to check on their younger brother, Denard, who also lived in the complex. Taylor then put some shorts on under her gown before also going outside. She saw the defendant as he entered a green car that was then driven from the scene. Taylor remembered being interviewed by Detective Harden after the shooting, and recalled telling her that the defendant left the scene in a green vehicle, but denied telling her that she saw the defendant with a gun that night. However, Detective Harden, who conducted and documented the unrecorded 2009 interview, testified that at that time Taylor specifically stated that just after the gunshots she saw the defendant with a gun in his right hand. According to Detective Harden, Taylor further stated that she heard the defendant state something to the effect, "all you motherf---ers can get it like he got it[,]" just before a female yelled at him, telling him to get into the car.
In addition to denying that she saw the defendant with a gun or had made a pretrial statement indicating as such, Taylor insisted at trial that her son, Bobby Singleton, was inside asleep at the time of the shooting. Taylor further testified that Singleton was schizophrenic and bipolar, was on medication, and had been hospitalized twice before the trial. She testified that although she was in her bedroom asleep at the time, she was certain that Singleton was in the living room sleeping on the sofa bed when the shots were fired because she was the last one to fall asleep that night and Singleton was on the sofa bed asleep before she entered her bedroom. She further testified that she did not hear her alarm that beeps when someone exits the apartment.
Although he indicated at trial that he had difficulty recalling the shooting or his pretrial interview, Singleton's recorded interview was extremely detailed. Singleton stated that the defendant began shooting at the victim after the victim gave Singleton the four dollars, but before Singleton could place the marijuana in the victim's hand. Singleton further specifically stated that the defendant initially missed the victim, but continued firing his weapon, as the victim fled after pushing Singleton out of harm's way. Singleton knew the defendant and did not express any doubts as to the defendant's identity as the shooter. Singleton indicated that immediately after the defendant shot the victim, the defendant turned to Singleton's brother, Denard, and stated, "You can get it too." Before the shooting, Singleton heard rumors that the defendant and the victim previously "got into it" during a marijuana transaction on Goodwood Boulevard. Singleton stated he and the defendant were "cool, tight" at the time of the offense, though there were past indications that the defendant wanted to kill Singleton due to rumors that Singleton had an affair with the defendant's girlfriend. Singleton described the defendant's gun as a rusty snub-nose .38 caliber firearm, noting that he saw it on another occasion before the shooting.[7] However, he was not absolutely certain that the defendant used the same *880 gun in the shooting as it was dark outside at the time.
Though he denied committing the shooting at trial, the defendant confirmed that Singleton was telling the truth about him being outside with Rae Michelle as the shots were fired.[8] The defendant testified that they left the scene immediately after the shooting because they wanted to bring the children, who were in London's apartment asleep at the time, to a safer environment. As noted, the defendant now argues on appeal that the jury should not have considered the substance of the out-of-court statements by Taylor and Singleton as proof of the matter asserted.
While a witness's prior inconsistent statement can be used to attack the credibility of that witness, until the 2004 amendment to Louisiana Code of Evidence article 801(D), it could not be used as substantive evidence of a defendant's guilt. See La. Code Evid. art. 607(D)(2) ; State v. Cousin , 96-2973 (La. 4/14/98), 710 So.2d 1065, 1069. Article 801(D)(1)(a) now provides that a prior statement by a witness is not hearsay[9] if the declarant testifies at the trial, is subject to cross-examination, and the statement is inconsistent with his testimony, provided that the proponent has first fairly directed the witness's attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted. State v. Harper , 2007-0299 (La. App. 1st Cir. 9/5/07), 970 So.2d 592, 601, writ denied , 2007-1921 (La. 2/15/08), 976 So.2d 173.
Both Taylor and Singleton testified at trial, at which time they were subject to cross-examination. As detailed above, they provided testimony that was inconsistent with their prior statements, after they were directed to their prior statements and given ample opportunity to admit the facts of their prior statements. While the defendant contends that the statements at issue were not corroborated, the record shows otherwise. The bicycle found next to the victim at the scene was consistent with Singleton's statement that the victim was riding his bicycle when he approached Singleton to inquire about purchasing marijuana to celebrate his birthday. As Singleton indicated, the victim's twenty-third birthday was imminent. The marijuana found near the victim's body was consistent with Singleton's claim that they were in the midst of a drug transaction, and that he was unable to place the marijuana in the victim's hand as the defendant approached and began firing at the victim. The victim's fatal gunshot wound in his back was consistent with Singleton's claim that the defendant initially misfired, but struck the victim as he was running away. Further, consistent with Taylor's pretrial statement, testimony presented at trial by Brown and London indicated that after the shooting, the defendant made confrontational statements before admittedly leaving the scene in London's green vehicle. Thus, pursuant to Article 801(D)(1)(a), we find that the prior statements by Taylor and Singleton may be considered as substantive evidence or may be given substantive effect.
Moreover, a prior statement by a witness which is "[o]ne of identification of *881 a person made after perceiving the person," is non-hearsay when the witness appears and is cross-examined on the statement. La. Code Evid. art. 801(D)(1)(c). Such a statement may be used assertively, as substantive evidence of guilt, and may be established through the testimony of one to whom the statement was made. This is so even if the witness denies making an identification or fails or is unable to make an in-court identification. State v. Stokes , 2001-2564 (La. 9/20/02), 829 So.2d 1009, 1010 (per curiam). See United States v. Brink , 39 F.3d 419, 426 (3rd Cir. 1994) (" 'If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the testimony of a person to whom the statement was made, and the statement can be given substantive effect.' ") (quoting Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence, § 801(d)(1)(C)[01], at 801-222 (1993) ); see also Wright , 730 So.2d at 489 (prior identification made of the defendant by the witness in his testimony before a grand jury was admissible when the witness testified at trial that he could not identify the defendant). Thus, pursuant to La. Code Evid. art. 801(D)(1)(c), the statements of prior identification of the defendant by Taylor and Singleton were non-hearsay, and any discrepancy between their prior statements and the in-court testimony was a matter for the jury to weigh. Wright , 730 So.2d at 489 (citing State v. Harper , 27,278 (La. App. 2d Cir. 8/23/95), 660 So.2d 537, 545, writ denied , 95-2318 (La. 1/12/96), 666 So.2d 320 ).
The verdict indicates the jury believed the pretrial statements by Taylor and Singleton and rejected the defendant's hypothesis of innocence denying that he was the shooter. According to London and the defendant's own trial testimony, the defendant was wearing a white T-shirt and jean shorts at the time of the shooting and left the scene in London's green vehicle. Manson Drive resident Brown looked out of his window just after hearing the gunshots, and observed a male wearing a white top and dark pants make confrontational statements before entering a green four-door vehicle. London similarly observed the defendant in a verbal confrontation just before he entered her vehicle. London testified that the defendant came to her apartment just after the shots were fired, abruptly asking for a ride home despite his previous plans to spend the night at London's apartment. Prior to the trial, Taylor positively identified the defendant as the person she saw, just after hearing the gunshots, as he was holding a gun in his right-hand, making confrontational statements, and leaving the scene in a green vehicle. Finally, Singleton's detailed account, including his unequivocal identification of the defendant as the shooter, was well corroborated by the physical evidence presented at trial as discussed above.
In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See Ordodi , 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway , 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire , 2014-2295 (La. 1/27/16), --- So.3d ----, ----, 2016 WL 314814 (per curiam). After a thorough review of the record, we are convinced that a *882 rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as a perpetrator. Accordingly, the counseled assignments of error lack merit.
LEADING QUESTION
In his pro se brief, the defendant argues that the prosecution's utilization of a leading question on the direct examination of London violated his due process right to a fair trial. The defendant notes that after his defense counsel objected and the trial court sustained the objection, the prosecutor immediately asked a question that he knew would elicit the answer that was suggested in the previous, leading question. The defendant argues that the trial court should not have allowed the prosecutor to rephrase the same question in a manner that would elicit the answer previously provided by the prosecutor. The defendant contends that the trial court allowed the prejudicial error to remain without admonishment or correction. He argues that he was prejudiced by the leading question because the prosecution at the time was "searching for evidence" to show that the defendant was involved in a conflict shortly after the shots were fired. He further argues that the evidence was weak in this case. Citing, in part, the trial court's reasons in denying the motion for post-verdict judgment of acquittal and motion for new trial, the defendant concludes that the statement in question assisted the jury in their guilty verdict.
A leading question is one that suggests the answer the witness is expected to give. State v. Odom , 2003-1772 (La. App. 1st Cir. 4/2/04), 878 So.2d 582, 592, writ denied , 2004-1105 (La. 10/8/04), 883 So.2d 1026. Generally, leading questions should not be used on the direct examination of a witness. La. Code Evid. art. 611(C). The use of leading questions is largely within the discretion of the trial judge. Only a clear abuse of discretion which prejudices the defendant's rights will justify reversal of a conviction. State v. Lynch , 94-0543 (La. App. 1st Cir. 5/5/95), 655 So.2d 470, 476, writ denied , 95-1441 (La. 11/13/95), 662 So.2d 466.
Herein, the defendant specifically refers to the following line of questioning on the direct examination of London by the State:
Q. Now, when he [the defendant] went back outside and the argument started with someone, could you hear what he said?
A. No, I didn't.
Q. All right. Did you ever hear him make a statement about "pussy ass niggers, I ain't to-"
Ms. Leigier [Defense Attorney]: Judge, I'm going to object for leading.
The Court: Sustained.
By Mr. Fontenot [State]:
Q. Did you make-Did you hear him make a statement?
A. Yes.
Q. What did he say?
Ms. Leigier [Defense Attorney]: Judge, I'm still objecting for leading.
Mr. Fontenot: I'm-I'm asking what he said.
By Mr. Fontenot:
Q. What did he say?
A. These pussy ass niggers better stop playing with me.
As the defendant notes on appeal, the trial court did not rule on the second objection. Further, the defendant did not seek a ruling on the second objection or move to admonish the jury. When a defendant objects to the admission of testimony, it is incumbent upon him to seek a ruling from the court, especially where, as in this case, the State immediately rephrases the *883 question in response to the initial objection. Absent a ruling by the court or a refusal by the court to rule, there is nothing for this court to review. See State ex rel. Clark v. Marullo , 352 So.2d 223, 228 (La. 1977) ; Lynch , 655 So.2d at 476. Herein, it was incumbent upon the defendant to seek a ruling on his objection that took place after the State rephrased the question.
Moreover, we disagree with the defendant's argument on appeal that he was denied a fair trial as a result of the State's line of questioning. The defendant is correct in noting that the trial court, when denying the post-trial motions, considered London's testimony in finding that there was sufficient corroboration for the jury to consider the out-of-court statements by Taylor and Singleton as substantive evidence. However, the trial court considered London's testimony in its entirety. Prior to the objectionable portion of her testimony, London had already testified that the defendant was not in her apartment at the time of the shooting. She further testified that within minutes of the shooting the defendant came back to the apartment, upset, irritated, asking for a ride home (although he and Rae Michelle had planned to spend the night there), and indicating that someone was after him or had shot at him. She subsequently testified that the defendant was arguing with someone just before they left the scene, and that during the ride home he vaguely apologized for what happened at her apartment. Thus, even in the absence of the portion of the testimony that was objected to on the basis of leading, London offered substantial evidence to corroborate the statements by Taylor and Singleton.
We reiterate that as to the level of corroboration required to properly consider prior statements as non-hearsay, La. Code Evid. art. 801(D) requires only "any additional evidence." Herein, London's testimony was not the only evidence at trial that corroborated the matter asserted in the pretrial statements by Taylor and Singleton. As noted above in addressing the sufficiency of the evidence counseled assignment of error, the defendant himself confirmed that Singleton was telling the truth about him being outside with Rae Michelle as the shots were fired. Furthermore, as heretofore noted, additional corroboration was provided by the physical evidence including the bicycle, the marijuana, and the location of the victim's fatal gunshot wound. As previously noted, the pretrial statements of identification made by Taylor and Singleton were also properly considered as substantive, non-hearsay under La. Code Evid. art. 801(D)(1)(c). In light of the substantial evidence against the defendant, we conclude that any error resulting from the line of questioning raised herein on appeal was harmless. La. Code Crim. P. art. 921. Considering the foregoing, the pro se assignment of error lacks merit.
CONVICTION AND SENTENCE AFFIRMED.

The victim suffered a through-and-through arm gunshot wound, a chest gunshot wound, and a fatal lower back (spine) gunshot wound that penetrated the left ventricle of his heart.

The gun was fully loaded at the time and there was no indication that it had been fired.

"Dre" was implicated by two additional anonymous tips, one to crime stoppers and one to Sergeant Harden.

According to the autopsy report, the victim was born on July 21, 1985, and his time and date of death is noted as 11:30 p.m., on July 20, 2008. Thus, the victim died just prior to his twenty-third birthday, as Singleton stated. At the trial that took place in January of 2016, over seven years after the offense, Singleton testified that he could not recall the statements he made during the interview and denied being outside at the time of the shooting. According to his testimony, Singleton was on medication at the time of the trial and had been hospitalized for mental conditions.

Lewis similarly testified that everyone, including her brother, Singleton, was asleep when the gunshots were fired. She testified they went outside to check on their brother, Denard Singleton, after the gunfire ceased, adding that they went through the alleyway. Although she "stumbled on" the victim's body and called 911, she did not make a pretrial statement or speak to anyone about the incident until two months before the trial.

Detective Morris testified that Singleton's description of the defendant's gun, a snub-nose revolver which do not eject cartridges, was consistent with the fact that no shell casings were found at the scene.

The defendant admitted at trial that his criminal record included a 1995 guilty plea to attempted armed robbery and a 1998 guilty plea to possession of a firearm by a convicted felon.

Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. Code Evid. art. 801(C).