STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0826

STATE OF LOUISIANA

VERSUS

GERREN WELCH

Judgment Rendered: **FEB 2 1 2020**

* * * * *

On Appeal from the
19th Judicial District Court,
Parish of East Baton Rouge, State of Louisiana
Trial Court No. 10-05-0206

The Honorable Richard D. Anderson, Judge Presiding

* * * * *

Hillar C. Moore, III
District Attorney
Dale R. Lee
Assistant District Attorney
Baton Rouge, Louisiana

Attorneys for the State of Louisiana

Prentice L. White
Baton Rouge, Louisiana

Attorney for Defendant/Appellant,
Gerren Welch

* * * * *

BEFORE: WHIPPLE, C.J., GUIDRY AND BURRIS,[1] JJ.

---

[1]    Hon. William J. Burris, retired, is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court.

**BURRIS, J.**

The defendant, Gerren Keith Welch, was charged by bill of information with attempted second degree murder, a violation of La. R.S. 14:30.1 and La. R.S. 14:27. He pled not guilty. After a trial by jury, he was found guilty as charged. He was sentenced to twenty-five years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, assigning error to the sufficiency of the evidence. For the following reasons, we affirm the conviction and sentence.

## FACTS

On or about August 24, 2005, officers of the Baton Rouge Police Department (BRPD) were dispatched to the scene of a shooting that took place on Seneca Street. After arriving on the scene, officers learned that the victim, Sylvester Williams, had been transported to a hospital by a civilian. While some officers were at the scene of the shooting, others responded to the hospital. After his arrival at the hospital, BRPD Detective Ross Williams came into contact with Denard Duheart, who relayed information regarding the shooting.

According to Duheart and Williams,[2] both of whom testified at trial, on the night in question, Duheart and Williams arranged to meet the defendant on Seneca Street.[3] Duheart drove and Williams sat in the front-passenger seat, as they were

---

[2]    Williams survived the shooting incident, although he suffered a gunshot wound to the back of his head that resulted in a bullet being permanently lodged in his head. Both Duheart and Kimoya Marshall Wells, a friend who was present at the scene shortly after the shooting, testified that Williams did not bleed from the shooting, nor did the police locate any blood while processing the vehicle. According to Duheart, X-rays later confirmed that the bullet remained in the victim's head. Due to the shooting, Williams' speech is impaired, and he suffers from partial paralysis. Based on his trial testimony, for the most part, he recalled what happened that night up to the moment he was shot.

[3]    At trial, Duheart, Williams, and Wells testified that they knew the defendant by his nickname, "Jig." Duheart, Wells, and Williams had known each other for years, but were not as familiar with the defendant. Duheart specifically testified that he had known the defendant for a couple of months prior to the shooting and was more familiar with the defendant than was Williams, while Wells testified that he met the defendant about a year before through one of his customers, he did not really know him. Duheart further confirmed that he had "three or four" drug transactions with the defendant before the night in question.

2

dropping off a female friend who was riding in the backseat. During the 11 o'clock hour, they pulled up to their friend's residence, she got out of Duheart's truck, and a vehicle occupied by the defendant and two other males approached.[4] The defendant got in the backseat of Duheart's truck, and a tense exchange ensued over money the defendant owed Duheart and Williams from a previous drug transaction.[5] The defendant indicated that he had the money. Duheart began to turn his body toward the backseat and saw the defendant bending over and acting as if he was counting his money.[6] After turning around, Duheart realized that the defendant had a gun pointed at Williams. Duheart described the defendant's gun as a .22 or .25 caliber, "small gun." The defendant suddenly fired the gun, shooting Williams in the head. Duheart specifically testified, "And as I started to turn around, I see that he had the gun pointed to Sylvester head, and he fired, and when he fired, I jumped in the back of the car, and we started wrestling, and I kind of like wrestled the gun out of his hand." Williams specifically testified, "I had asked him 'Where's my money,' you know. And he said, 'Hold up.' And, you know, 'I'm going to give it to you.' And before I knew it, he shot me, you know."

After Duheart wrestled the gun from the defendant, he began strangling the defendant. The vehicle in which the defendant arrived then pulled up, and Duheart heard the occupants say, "Shoot him, shoot him, shoot him." Fearing that one of the occupants of the other vehicle had a gun, Duheart released the defendant, who jumped out of Duheart's truck and ran to the other vehicle as the driver took off.

---

[4]     Duheart testified that they were parked under a street light that was beaming into his truck.

[5]     Duheart testified the defendant owed them $1,000.00, explaining they provided the defendant 200 ecstasy pills that sell for $5.00 a piece. Williams testified the defendant owed them "two grand."

[6]     Duheart testified that he was able to see "a little money" in the defendant's hands, but did not believe it was the full two thousand dollars owed by the defendant.

Duheart ran to the home of Kimoya Marshall ("Wells")[7], a friend who lived next door to the female whom Duheart and Williams had dropped off, and began knocking on the front door while saying, "Call the police, call the police." Considering Williams' condition, Duheart decided to transport him to the hospital instead of waiting for an ambulance or the police.

Wells, who also testified at trial, was at a next-door neighbor's residence at the time. He came outside as he heard Duheart beating on his door. Wells indicated that when he approached Duheart's truck, he saw Williams, who was unresponsive with his eyes "rolling in the back of his head." Wells also saw a gun on the backseat of the truck, which he grabbed. After Duheart left to take Williams to the hospital, Wells threw the gun in a grassy area near the interstate at Scenic Highway. Later, about twenty minutes after Duheart left the scene to take Williams to the hospital, Wells called Duheart to see what happened. When Duheart told Wells that the defendant had shot Williams and that the police were looking for the gun, Wells revealed that he had taken possession of the gun and "threw it somewhere." Duheart conveyed this information to the police. Days later, Wells and Duheart went to the police station and assisted the police in recovering the gun.

## SUFFICIENCY OF THE EVIDENCE

In the sole assignment of error, the defendant argues that the evidence is insufficient to support the verdict. The defendant specifically claims the victim was accidentally shot during the struggle over Duheart's gun. Initially, as to the struggle that the defendant claims resulted in the shooting, he first contends, "it was Duheart who started struggling with [the defendant] when the shooting happened." He notes that Duheart's friend, Wells, took possession of the handgun after the shooting in an

---

[7]    At trial, the witness stated that his name is "Kimoya Charles Marshall," but he goes by the nickname "Wells."

4

effort to protect Duheart. He further notes that Wells did not initially inform the police that he had taken the gun from Duheart's truck. The defendant contends that the physical evidence, including fingerprints, only proved the uncontested fact that he was in Duheart's truck at the time of the shooting, but did not prove that he was the shooter. The defendant argues that the State's case was merely based on the self-serving testimony of Duheart, a man who admittedly sold illegal drugs. In an apparent contradiction to his prior claim, the defendant concludes that the State was not able to overcome the reasonable hypothesis of innocence that "Williams was shot as a result of the struggle he had with Duheart inside the SUV." Further, the defendant avers that it was reversible error for the trial court to accept the jury's guilty verdict, "considering that it would be difficult [to] truly identify [him] as the person responsible for Williams' injuries."[8]

The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also* La. Code Crim. Pro. art. 821(B); *State v. Ordodi*, 06-0207 (La. 11/29/06), 946 So. 2d 654, 660; *State v. Jackson*, 18-0261 (La. App. 1 Cir. 11/2/18), 265 So. 3d 928, 933, *writ denied*, 18-1969 (La. 4/22/19), 268 So. 3d 304. The *Jackson* standard of review, incorporated in Article 821, is an

---

[8] During opening statements at trial, the defendant presented another argument that seemingly conflicts with both of the above claims regarding a supposed struggle over the gun as it discharged. Specifically, in giving his account of what happened after the defendant entered the backseat of Duheart's truck, defense counsel claimed the victim was dissatisfied with the amount of money offered by the defendant and demanded more money at gunpoint. As defense counsel further claimed, "Sylvester Williams pulls a gun, turns around in his seat and points it at Gerren Welch .... Gerren reaches forward, grabs that weapon, both of them are tussling over the weapon. The weapon fires. It went off and the bullet then strikes Sylvester in his head." Defense counsel claimed that after the shooting, Duheart climbed into the backseat, attempted to grab the gun, and tussled with the defendant over the gun before the defendant exited the vehicle and fled. The defendant did not testify at trial.

5

objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.

When analyzing circumstantial evidence, Louisiana Revised Statutes 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. *See State v. Patorno*, 01-2585 (La. App. 1 Cir. 6/21/02), 822 So. 2d 141, 144. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. *State v. Dyson*, 16-1571 (La. App. 1 Cir. 6/2/17), 222 So. 3d 220, 228, *writ denied*, 17-1399 (La. 6/15/18), 257 So. 3d 685.

A person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and "does or omits an act for the purpose of and tending directly toward the accomplishing of his object." La. R.S. 14:27(A). Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).

Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. *State v. Coleman*, 17-1045 (La. App. 1 Cir. 4/13/18), 249 So. 3d 872, 877, *writ denied*, 18-0830 (La. 2/18/19), 263 So. 3d 1155. To be guilty of attempted second degree murder, a defendant must have the specific intent to kill and not

merely the specific intent to inflict great bodily harm. *State v. Collins*, 09-2102 (La. App. 1 Cir. 6/28/10), 43 So. 3d 244, 251, *writ denied*, 10-1893 (La. 2/4/11), 57 So. 3d 311, *cert. denied*, 565 U.S. 818, 132 S.Ct. 99, 181 L.Ed.2d 27 (2011). Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. *State v. Delco*, 06-0504 (La. App. 1 Cir. 9/15/06), 943 So. 2d 1143, 1146, *writ denied*, 06-2636 (La. 8/15/07), 961 So. 2d 1160; *State v. Maten*, 04-1718 (La. App. 1 Cir. 3/24/05), 899 So. 2d 711, 716, *writ denied*, 05-1570 (La. 1/27/06), 922 So. 2d 544; *State v. Henderson*, 99-1945 (La. App. 1 Cir. 6/23/00), 762 So. 2d 747, 751, *writ denied*, 00-2223 (La. 6/15/01), 793 So. 2d 1235. Further, unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the factfinder, is sufficient to support a factual conclusion. *State v. Marshall*, 04-3139 (La. 11/29/06), 943 So. 2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007).

At trial, Duheart testified that during the verbal exchange over the money the defendant owed him and Williams, Duheart turned around, saw the defendant in the backseat with a gun pointed at Williams, and saw the defendant shoot Williams. At that point, Duheart believed that the defendant was going to shoot him next, so he jumped into the backseat and wrestled with the defendant over the gun. As they wrestled, the gun fell, and Duheart started "twisting [the defendant's] neck." When the vehicle that the defendant previously arrived in pulled up, Duheart released the defendant.

In identifying the defendant and relaying the incident to Detective Williams, Duheart referred to the defendant as "Jig," the "street name" by which Duheart knew the defendant at the time. He subsequently identified the defendant in a photographic lineup and again in court at trial. During cross-examination, after being shown hospital admission records, Duheart confirmed that he told hospital personnel that the defendant pulled out a gun and the gun went off.

7

While at the hospital, Duheart agreed to turn his truck over to the police. Duheart denied tampering with anything in his truck before turning it over to the police. Officer Paul Crause and Corporal Kevin Adcock of the crime scene division of the BRPD processed Duheart's truck, a Chevrolet Tahoe. A .45 Glock pistol located in Duheart's vehicle was photographed before being removed from its location in "the front door pocket on the passenger side." Officer Crause, who recovered the gun from Duheart's truck, testified that in order to fire that particular gun, it was necessary to "rack the slide," which he further described as bringing the "slide back and bring a bullet out of the magazine and bring it up into the chamber ready for firing." At the time of its recovery, there were no rounds in the chamber of the gun, but six live rounds were in the magazine.

Duheart admitted that he owned a gun and confirmed that it was in his truck on the night in question, as he had instructed Williams to grab it on their way out. While Duheart was aware that his gun was in his truck at the time of the shooting, he did not know its exact location until he saw the photograph of the passenger-side door compartment taken by the police after the shooting. He identified the .45 Glock pistol photographed by the police as his gun. Duheart testified that Williams did not have the gun in his hands while the defendant was in the truck and denied that he or Williams pulled a gun out on the defendant. Williams similarly denied threatening the defendant or pulling out a gun on him. When asked if he saw Duheart with a gun, Williams stated, "No," adding, "From my suggestion Denard was trying to fight off 'Jig,' you know."

Duheart and Wells both testified about a conversation that they had after the shooting wherein Wells told Duheart that he had removed a .22 caliber gun from Duheart's truck because he believed that the gun belonged to Duheart. Duheart explained to Wells that he actually had a .45 caliber gun and that the gun he removed from the vehicle must have been the one the defendant used to shoot the victim.

Duheart specifically testified, "He said he had picked the gun up and went and threw it somewhere, because he thought it was my gun. I guess he was trying to protect me or whatever. And when I told him about what happened, he was like, 'Cool.' I told the detectives what happened."

On the day following the shooting, based on information provided by Duheart, Officer Ike Vavasseur and Sergeant Dee[9] Reed of the homicide division of the BRPD went to Wells' residence to search for the gun that was used to shoot Williams. Wells signed a form giving the officers consent to search underneath the house. However, at the time of that search, Wells did not reveal the location of the gun to the police, nor did the police question him in that regard. The officers left after a brief search of the exterior of the home, unable to locate the gun, and reported the negative results of the search to Detective Williams and Detective Chris Polito.

Corporal Adcock later recovered the Lorcin .22 caliber gun from the field off of Scenic Highway, where Wells indicated that he discarded it. When it was recovered, it had five live rounds in the magazine and one live round in the chamber. Jeff Goudeau of the Louisiana State Police Crime Lab, who was qualified at trial as an expert firearm examiner, testified that the Lorcin pistol had a safety that had to be deactivated in order to allow it to be fired. The Glock, however, did not have an external safety. As to a possible accidental discharge of the weapons in evidence, Goudeau testified, "both of them would indeed require a pull of the trigger to go off."

At the outset, we note that the defendant's specific intent to kill the victim may be properly inferred from his act of pointing the gun at the victim's head and firing it. *Henderson*, 762 So. 2d at 751. Duheart and Williams repeatedly denied pulling a gun on the defendant or wrestling with him before the gun was fired. The

---

[9]    The trial transcript displays Sergeant Reed's name as "D. Reed." However, in the written report that Officer Vavasseur generated relative to the search, he reports Sergeant Reed's name as being "Dee Reed."

jury obviously rejected the version of the facts presented by the defense and concluded that the shooting was not accidental. We find such a rejection reasonable. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. *Coleman*, 249 So. 3d at 878. We cannot say that the jury's determination was irrational under the facts and circumstances presented to them. *See Ordodi*, 946 So. 2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. *See State v. Mire*, 14-2295 (La. 1/27/16), 269 So. 3d 698, 703 (*per curiam*); *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417, 418 (*per curiam*). After a thorough review of the record, viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of attempted second degree murder. Thus, this sole assignment of error lacks merit.

**CONVICTION AND SENTENCE AFFIRMED.**