**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2023 KA 0816

STATE OF LOUISIANA

VERSUS

BLAYSON PAUL FIFE

Judgment Rendered: **APR 1 9 2024**

* * * * *

On Appeal from the
Twenty-First Judicial District Court
In and for the Parish of Livingston
State of Louisiana
No. 36276, Sec. C

The Honorable Ericka W. Sledge, Judge Presiding

* * * * *

Prentice L. White
*Louisiana Appellate Project*
Baton Rouge, Louisiana

Attorney for Defendant/Appellant
Blayson Paul Fife


Scott M. Perrilloux
*District Attorney*
Brett Sommer
*Assistant District Attorney*
Livingston, Louisiana

Attorneys for Appellee
State of Louisiana

* * * * *

**BEFORE: WELCH, WOLFE, AND STROMBERG, JJ.**

**STROMBERG,**

The defendant, Blayson Paul Fife, was charged by unanimous jury verdict by amended grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1.[1] He pled not guilty and, following a jury trial, was found guilty as charged. The trial court denied the defendant's motion for post-verdict judgment of acquittal and motion for new trial and sentenced the defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant now appeals, assigning error to the sufficiency of the evidence. For the following reasons, we affirm the conviction and sentence.

## FACTS

On July 23, 2017, officers responded to a residence located at 13990 Pine Park Road in Walker, Louisiana, after a concerned neighbor called 911 and asked police to check in on the home's owner, Rick McBride. Upon entering the home, officers discovered McBride's body with multiple gunshot wounds. Pursuant to the investigation, officers arrested Joe Baluch, Jr., and the defendant for the murder of Rick McBride.

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, the defendant argues the trial court erred in denying his motion for new trial because the evidence presented at trial was insufficient to support his conviction for second degree murder.[2]

---

[1] The instant case involves a retrial. The defendant was initially charged with first degree murder, a violation of La. R.S. 14:30, and, following a trial, was found guilty by a non-unanimous jury verdict of the responsive offense of second-degree murder. In light of **Ramos v. Louisiana**, 590 U.S. ___, 140 S.Ct. 1390, 1397, 206 L.Ed.2d 583 (2020), this court set aside the defendant's conviction and sentence and remanded to the district court for a new trial. **State v. Fife**, 2020-0140 (La. App. 1st Cir. 12/30/20), 2020 WL 7768709, *1 (unpublished).

[2] The defendant raised this argument to the trial court in a combined motion for post-verdict judgment of acquittal or new trial, which was denied. However, on appeal, he argues only that the trial court erred in denying the motion for new trial. We note that the question of sufficiency

2

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Coleman, 2021-0870 (La. App. 1st Cir. 4/8/22), 342 So.3d 7, 11, writ denied, 2022-00759 (La. 11/21/23), 373 So.3d 460; see also La. Code Crim. P. art. 821(B).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Coleman, 342 So.3d at 12. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Bessie, 2021-1117 (La. App. 1st Cir. 4/8/22), 342 So.3d 17, 22, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

---

of the evidence is properly raised by a motion for post-verdict judgment of acquittal, not a motion for new trial. See La. Code Crim. P. art. 821; State v. Southall, 2022-0746 (La. App. 1st Cir. 6/2/23), 369 So.3d 925, 929 n.4, writ denied, 2023-00875 (La. 2/6/24), 378 So.3d 750. Appellate courts may review the grant or denial of a motion for new trial only for errors of law. See La. Code Crim. P. art. 858; State v. Francis, 2019-1392 (La. App. 1st Cir. 12/17/20), 318 So.3d 862, 867 n.6. Accordingly, the only issue reviewable in this assignment of error is the constitutional issue of sufficiency of the evidence, which was raised in the defendant's motion for post-verdict judgment of acquittal. Id.

3

Second degree murder is defined as the killing of a human being when the offender has either the specific intent to kill or inflict great bodily harm, or is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including but not limited to aggravated burglary, even though he has no intent to kill or to inflict great bodily harm.[3] La. R.S. 14:30.1(A)(1) and (2). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be proven by direct evidence, such as a defendant's statements, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **Coleman**, 342 So.3d at 12.

The State bears the burden of proving the elements of the offense, along with the burden of proving the defendant's identity as the perpetrator. When, as in this case, the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **Bessie**, 342 So.3d at 22-23.

Dr. Karen Ross performed the autopsy on McBride and testified that McBride suffered four gunshot wounds to his neck, shoulder, back, and hips. Dr. Ross testified that McBride's cause of death resulted from the multiple gunshot wounds.

---

[3] Aggravated burglary is the unauthorized entering of any inhabited dwelling where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances: (1) if the offender is armed with a dangerous weapon; (2) if, after entering, the offender arms himself with a dangerous weapon; or (3) if the offender commits a battery upon any person while in such place, or in entering or leaving such place. La. R.S. 14:60(A).

4

Joe Baluch, Jr., testified that on the night of the murder, he was with a group of friends at Trevor Lockett's residence in Gonzales, Louisiana. Also at Lockett's house were Lockett, Kerstin Avery, Alexis Sahr, Kameron Jones, and the defendant. At some point, the defendant approached Baluch and stated that he knew where they could "hit a lick[,]" which meant to commit a robbery. The defendant told Baluch that he had a key and no one would be at the home. Baluch testified that as he drove, the defendant provided directions to McBride's residence.[4] Upon arriving at the home, they observed a white truck in the driveway, and the defendant told Baluch that the vehicle did not belong to the home's owner. After they were unable to locate a key on the front porch, they walked around to the back of the house, where the defendant climbed on the meter box and broke a window with a .410 shotgun, then climbed through the window and unlocked the back door for Baluch.

Baluch testified that he and the defendant then began searching through various rooms, where Baluch retrieved a black and green Sig 9 millimeter firearm and a white safe. After noticing a light on, he looked into the master bedroom and observed McBride's feet in a recliner. Baluch and the defendant then exited the home. However, according to Baluch, the defendant re-entered McBride's home looking for money and more firearms, while Baluch got in the car. After Baluch had been sitting in the car for five to ten minutes, he heard four or five gunshots. Baluch testified that the defendant, carrying a camouflage bag filled with firearms, ran back to the vehicle and told him that he "had to off him" and that he was going to get "teardrops."[5]

---

[4] Baluch testified that prior to that night, he had never been to the residence, and he did not know the home belonged to McBride.

[5] Baluch testified that he interpreted these statements to mean the defendant had killed McBride and would get a teardrop tattoo on his face, indicating he killed someone.

Baluch further testified that he and the defendant then traveled back to Lockett's residence, where the defendant unloaded all of the firearms stolen from McBride's home. According to Baluch, the defendant then asked him to return to McBride's home because he scraped his leg and needed to clean up blood; however, Baluch refused. Baluch testified he then left Lockett's home and traveled to a levee on the Mississippi River, where he attempted to destroy, and ultimately disposed of, the safe he stole from McBride's residence.[6] Later that morning, Baluch met up with the defendant, who gave him one thousand dollars in cash out of the ten thousand dollars he stole from McBride's residence. Baluch testified he was later arrested and charged with principal to first degree murder and aggravated burglary, but the State agreed to drop the principal charge in exchange for his testimony at trial. He pled guilty to aggravated burglary and spent four years and one day in prison.

Alexis Sahr testified that she arrived at Lockett's residence at approximately midnight on the night of the murder. According to Sahr, Baluch and the defendant arrived at around 2:00 a.m., and the defendant was carrying a large, dark green bag filled with multiple firearms. About twenty minutes later, Sahr drove the defendant to a gas station, where the defendant met up with a "tall" and "heavy set" man. Sahr testified that in the week prior to the murder, she drove the defendant, who provided directions, to somewhere in Livingston Parish.

J.S. testified that on the night of the murder, he and Jace Chiquelin received repeated phone calls from Jones, who asked them to give the defendant a ride to the hospital.[7] According to J.S., he and Chiquelin picked up the defendant at

---

[6] The safe was eventually discovered in the water by Bruce Jeanfreau, who was operating a boat on the Mississippi River. It is unclear from the record when this occurred.

[7] J.S. was a minor at the time of the incident. In order to protect his confidentiality, we refer to him only by his initials. See Uniform Rules of Louisiana Courts of Appeal, Rule 5-2.

Chip's Grocery, after which the defendant stated he needed to stop at his grandfather's house. The defendant gave directions while Chiquelin drove to Walker. After they arrived at the residence, J.S. and the defendant walked through the back door, where J.S. remained at the doorstep for about twenty-five to thirty minutes. J.S. then began to look through the house for the defendant and found him sitting on the couch rummaging through a bag. J.S. testified that he then observed McBride's body on the floor. J.S. ran back to Chiquelin's vehicle, and the defendant eventually returned with the bag. Chiquelin confirmed J.S.'s testimony and testified that J.S. ran hysterically back to the vehicle, after which the defendant came out of McBride's home carrying a large duffel bag.

Kerstin Avery testified that the defendant called her around midnight and asked if she could pick him up in Dutchtown.[8] When she arrived, the defendant entered her vehicle and directed her to Walker. Avery testified that upon arriving at the home in Walker, she stayed in her vehicle while the defendant went inside the home for approximately fifteen minutes. The defendant made two return trips carrying cash and multiple firearms, which he then placed in the trunk of her car. Thereafter, Avery and the defendant devised a plan to travel to California with Jones and Lockett. On the return trip to Louisiana, they were detained by law enforcement in Texas near the Mexican border.

Trevor Lockett testified that on the night of July 21, 2017, the defendant asked him if he wanted to "hit a lick," to which Lockett responded in the negative. The defendant then left at approximately 9:00 p.m. and returned between 11:00 p.m. and 1:00 a.m. with Baluch. When the defendant returned, he brought several guns into Lockett's home, and Lockett told him to leave. Lockett testified that around 11:00 a.m. on July 22, 2017, he and Jones met up with the defendant and

---

[8] We note that, according to Avery's phone records, her phone did not begin traveling west from her home in Maurepas to the Dutchtown area until 5:11 a.m. on July 22, 2017.

7

Avery and traveled to California. The defendant had several handguns, as well as a significant amount of money, which he did not have when Lockett saw him the night before. Lockett and Jones took cell phone photos and videos of each other, and the defendant, handling guns and cash. Lockett testified that just before they entered California, the defendant told him that he "hit a lick and killed somebody[.]" Specifically, the defendant told Lockett that the victim was in a recliner, and he shot him five or six times, left, and went back to the house multiple times.

Sergeant Phillip Lint with the Livingston Parish Sheriff's Office (LPSO) testified that he was the first responding officer to McBride's home. Sergeant Lint entered the residence and observed McBride lying on his back, with blood around his head, apparently deceased. He also observed an empty pistol holster at McBride's feet and a large gun safe, which was open, in the living room. The rear door of the residence was open, and the windows in the master bedroom and laundry room were broken.

Through the investigation, Detective Jim Brown with the LPSO learned that Baluch may have been involved in the case. Detective Brown testified that Baluch agreed to come in for questioning and voluntarily provided his cell phone. During the interview, Baluch indicated he retrieved a weapon from McBride's house, which was later recovered from Baluch's bedroom.

Captain Raymond Coxe with the LPSO, an expert in digital forensics, examined the hard drives from computers in McBride's residence, as well as the cell phones of Lockett and Jones. Captain Coxe located the serial number of a firearm shown in a video, cross referenced it with a list of McBride's firearms, and determined it belonged to McBride. Captain Coxe testified that the gun from the

8

video was never recovered. Captain Coxe recovered a second video depicting the defendant shooting a gun on the side of the road in New Mexico.

Michelle Olinde, an expert in the field of ballistics, conducted a ballistics analysis in this case. Olinde analyzed eight 9 millimeter cartridge cases, seven from McBride's home and one from New Mexico, and determined that they were all fired from the same unknown firearm. Olinde also determined that the cartridge cases were not fired from any firearm found in McBride's home, nor were they fired from the Sig 9 millimeter firearm collected from Baluch's residence.

Paul Berry, an expert in the field of DNA analysis, compared evidence collected from the scene to DNA reference samples from McBride and the defendant. Berry obtained a DNA profile from a swab of contact DNA collected from latent prints found on top of the dryer, which indicated a mixture of DNA from a minimum of two contributors and from which the defendant could not be excluded as a contributor.

Timothy Piper, an expert in the field of cell phone record analysis, analyzed the cell phone records of several individuals suspected to be with the defendant prior to, during, and after the time of the murder. Piper testified that from 12:02 a.m. to 12:31 a.m. on July 22, 2017, Baluch's phone pinged off the Walker tower in the same sector which covered McBride's home. Piper further testified that at around 3:00 a.m., J.S. and Chiquelin's phones were in the area of McBride's home. Finally, at around 6:30 a.m., Avery's phone was near McBride's home.

After the jury returned a unanimous guilty verdict, the trial court reviewed the polling forms and discovered that one juror indicated that guilty was not her verdict. The trial court asked her if she did not vote guilty, to which she responded that she did vote guilty based on the legal definition provided, but that she did not want to do so. Defense counsel argued the juror's hesitation meant there was not a

9

unanimous vote of guilty. The trial court instructed the jury to continue deliberating "in the attempt of reaching a unanimous verdict," after which the jury again returned a unanimous guilty verdict.

On appeal, the defendant asserts the evidence presented at trial did not establish beyond a reasonable doubt that he, rather than Baluch, killed McBride. Specifically, the defendant claims his conviction was based on the false, dishonest testimony of Baluch, who was convicted of aggravated burglary and sentenced to only four years in prison. He further argues Baluch's dishonest testimony caused one juror to have reasonable doubt about his guilt.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. **Bessie**, 342 So.3d at 23.

In finding the defendant guilty of second degree murder, it is clear the jury rejected the defendant's theory that he was not the shooter. Although Baluch initially lied to police, the jury heard Baluch's testimony and found him credible. Baluch testified that after he and the defendant broke into McBride's home, realized McBride was home, and left, the defendant then re-entered the home to steal additional items, after which Baluch heard gunshots. At trial, Baluch readily admitted that in his interview with police, he lied regarding the extent of his involvement in the crime because he was scared, though he later confessed. While the State agreed to drop the principal to first degree murder charge in exchange for

10

his testimony, Baluch testified he would not lie to receive such benefit and stated he was telling the truth to the jury. Finally, although one juror stated she did not want to vote guilty, she did, in fact, vote guilty based on the law. Despite the defendant's argument that the juror had a reasonable doubt as to his guilt because of Baluch's testimony, we note the juror did not give any reasoning for why she did not want to vote guilty. Furthermore, the fact that Baluch initially lied to officers does not render his testimony insufficient to support a conviction. Rather, any discrepancy between his pre-trial statement and his in-court testimony goes to the weight of the evidence, not its sufficiency. See State v. Coleman, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 881, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155.

The State also presented extensive evidence of the defendant's actions leading up to and following the murder. Based on Sahr's testimony that she and the defendant drove to a home in Livingston Parish one week prior to the murder, the jury could have rationally presumed that the defendant and Sahr went to McBride's home to scope it out. On the night of the murder, the defendant and Baluch broke into McBride's home, where they saw McBride alive before they left. The defendant then re-entered the home to steal firearms, at which point he shot McBride several times. Approximately three hours later, the defendant returned to McBride's home a second time with Chiquelin and J.S. to steal money and additional firearms. The defendant returned to McBride's home a third time with Avery and stole more of McBride's belongings. Avery, Lockett, Jones, and the defendant then traveled to California with several firearms and a significant amount of cash stolen from McBride's home. Flight and attempt to avoid apprehension indicate consciousness of guilt, and therefore, are circumstances from which a juror may infer guilt. State v. Southall, 2022-0746 (La. App. 1st

11

Cir. 6/2/23), 369 So.3d 925, 933, writ denied, 2023-00875 (La. 2/6/24), 378 So.3d 750.

The phone records introduced at trial corroborated the testimony of Baluch, as well as everyone who was with the defendant after the murder. The phone records showed Baluch, Chiquelin, J.S., and Avery all in Walker near McBride's home at various times on the night of the murder. The State also submitted uncontroverted evidence that the defendant's DNA was found in McBride's home. Ballistics evidence established that the gun the defendant shot in New Mexico matched a gun stolen from McBride and the shell casings recovered at the crime scene. According to Lockett, the defendant discarded some of the weapons during the trip to California, including the firearm used to kill McBride. Thus, the jury could have concluded that the defendant possessed the murder weapon and intentionally disposed of it. Finally, shortly after the murder, the defendant confessed that he killed McBride to both Baluch and Lockett, providing explicit details about how the murder occurred, which matched the evidence at the scene.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the State proved beyond a reasonable doubt all of the elements of second degree murder and the defendant's identity as the perpetrator. This assignment of error is without merit.

## PATENT ERROR

Pursuant to Louisiana Code of Criminal Procedure article 920(2), this court routinely conducts a review of all appeals for error discoverable by mere

12

inspection of the pleadings and proceedings and without inspection of the evidence. **State v. Anthony**, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 775. After a careful review of the record, we have found two patent errors, both of which have been noted by the defendant on appeal.

The record reflects that after the trial court imposed the sentence herein, it failed to advise the defendant of the applicable time periods to file a motion for appeal or application for post-conviction relief. Nonetheless, we note the defendant filed a timely appeal under La. Code Crim. P. art. 914; thus, the trial court's failure to advise the defendant of the prescriptive period for appeal is moot. See **State v. Williams**, 2011-0427 (La. App. 5th Cir. 2/28/12), 88 So.3d 1102, 1113.

With respect to post-conviction relief, La. Code Crim. P. art. 930.8(C) provides that, at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for applying for post-conviction relief. See **State v. LeBoeuf**, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Its failure to do so, however, has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. Further, the Article does not provide a remedy for an individual defendant who is not told of the limitations period. **Id.** at 1142-43.

Out of an abundance of caution, and in the interest of judicial economy, we note for the record and advise the defendant that La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922. **Id.** at 1143.

**CONVICTION AND SENTENCE AFFIRMED.**

13