STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2021 KA 1117

STATE OF LOUISIANA

VERSUS

DEMOND BESSIE

Judgment Rendered: **APR 0 8 2022**

* * * * *

On Appeal from the
19th Judicial District Court
Parish of East Baton Rouge, State of Louisiana
Trial Court No. 09-14-0860

The Honorable Louis R. Daniel, Judge Presiding

* * * * *

Hillar C. Moore, III
District Attorney
Allison Miller Rutzen
Assistant District Attorney
Baton Rouge, Louisiana

Attorneys for Appellee,
State of Louisiana

Gail Horne Ray
Baton Rouge, Louisiana

Attorney for Defendant-Appellant,
Demond Bessie

* * * * *

BEFORE: McDONALD, LANIER, AND WOLFE, JJ.

**WOLFE, J.**

The defendant, Demond Bessie, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty. After a trial by jury, he was unanimously found guilty as charged. The trial court denied the defendant's motion for new trial. The defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, challenging the sufficiency of the evidence and the denial of his motion for new trial. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On May 1, 2014, officers of the Baton Rouge City Police Department were dispatched to the scene of a shooting at the Newport Villa Apartments, located at 1737 La Annie Drive in Baton Rouge. The victim, Elbert Bertrand Marshall, was located by a stairwell at an apartment complex across the street, at 12254 La Margie Avenue.[1] The victim was in critical condition with multiple gunshot wounds. EMS transported the victim to the hospital where he died shortly after arriving.

Corporal Brandon Bethany and Corporal Jerry Lofton were among the officers who arrived at the scene, which the officers helped to secure. Steaphon Harris, who was reportedly with the victim at the time of the shooting, provided the police with a statement on the scene. Harris was subsequently interviewed by Detective Robert Cook at the Violent Crime Unit, and signed voluntary consent forms for the search of his DNA and two cell phones that were in his possession at the time, a Samsung Galaxy S4 that belonged to Harris and an Apple iPhone that belonged to the victim.

---

[1] The victim, who was a resident of the Newport Villa apartments, had a gold chain and approximately $1,000 on his person at the time.

2

Corporal Andrew Desalvo arrived at approximately 4:00 a.m., after EMS transported the victim and the scene was secured. Corporal Desalvo collected evidence and took photographs, and recorded a video of the scene, which depicted vehicles and other items discovered at the scene of the shooting, such as blood on the ground in the parking lot and breezeway, a firearm, fired bullets, a set of car keys, and a cell phone.[2] One of the vehicles, a silver Toyota Yaris, and the keys were later identified as belonging to the victim.[3] The firearm, a Taurus 145, .45 caliber pistol, was loaded with one round in the chamber and eight rounds in the magazine when it was recovered, and no shell casings were found at the scene. Corporal Desalvo took DNA swabs from the pistol, magazine, ammunition, and cell phone and sent them to the Louisiana State Police Crime Lab (LSP crime lab) for further analysis.[4] Corporal Desalvo took additional video footage and photographs at the apartment complex on La Margie Avenue, approximately 200 yards from the photographed vehicles, showing additional blood by the stairwell.

On May 2, 2014, Sergeant Glenn Hutto attended the victim's autopsy, at which he took photographs and collected evidence. The victim suffered four gunshot wounds including bullet injuries to the rear triceps region of his right arm and to his chest. Sergeant Hutto collected two bullet fragments removed from the victim's right arm and a DNA swab of the victim and sent them to LSP crime lab for

---

[2] The keys were found across the street from the Newport Villa Apartments, at the apartment complex on La Margie Avenue. The manager of the apartment complex on La Margie Avenue delivered the keys to Detective Robert Cook after they were discovered near the area where the victim had been found.

[3] The other vehicle, a green Fiat parked next to the Yaris, was owned by a resident of the Newport Villa Apartments who was inside her apartment at the time of the shooting. The Fiat was struck by gunfire, which went through the rear glass and rear quarter panel on the driver's side of the vehicle.

[4] According to Paul Berry, a Louisiana State Police Crime Lab forensic DNA analyst who testified as an expert witness at trial, the victim could not be excluded as the major contributor to the DNA profiles collected from the pistol and cell phone. The remaining DNA evidence was inconclusive with the exception of the defendant being excluded as a minor contributor to the DNA profile from the cell phone.

testing. Cheryl Swearingen of the LSP crime lab, a crime scene investigator and firearms examiner who was accepted at trial as an expert in firearms examination, testified that the bullet fragments removed from the victim's right arm were consistent with .38 caliber.

Detective Robert Hunt of the Criminal Investigation Bureau, Technical Section, which conducts digital forensics, performed a cell phone extraction of Harris's cell phone and compiled a detailed, time-logged report. Detective Cook reviewed the extracted records, including deleted but recovered text messages, using words and phrases such as "smash" and "put dat iron on" in reference to the victim.[5] He also provided the victim's address and a description of the victim's vehicle to determine that Harris was communicating with a person whose phone number, 225-620-7129, labeled as "Mond," to arrange for the murder of the victim. In another text message, "Mond" indicated that his girlfriend was purchasing .38 caliber bullets on April 30th. Based on the cell phone communications, Detective Cook sought and acquired a warrant for Harris's arrest. Further, assuming that "Mond" was a shorter version of a full name, Detective Cook searched the police database and concluded that the defendant was the other suspect for the victim's murder.

## ASSIGNMENT OF ERROR NUMBER ONE

In assignment of error number one, the defendant argues that a complete reading of the trial transcript reveals that the State failed to present sufficient evidence to support the verdict. He contends there was no direct evidence to place him at the scene of the murder. He notes there was no DNA evidence to link him to the offense, the ballistic evidence was inconclusive, and some evidence collected at the scene was not tested. He further notes that there was no effort to conduct a lineup

---

[5] Detective Cook testified at trial that he learned some street language in the course of his involvement in numerous investigations. Specifically, Detective Cook testified that when used in the context referenced herein, the term "smash" meant to "[t]o take out" or kill someone and to put an "iron" on someone meant to use a gun to kill the person.

identification by Jarvis Clark, a potential witness.[6] The defendant also notes that at least three witnesses informed the police that there was more than one person known to them as "Mond." The defendant notes that his girlfriend testified that he never wore dreadlocks.[7] The defendant concludes that due to gaps in the State's evidence, no reasonable trier of fact could have found him guilty beyond a reasonable doubt. In response, the State argues that based on the evidence presented at trial, the jury was not irrational in rejecting the defendant's hypothesis of innocence.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV, § 1; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Williams**, 2019-0077 (La. App. 1st Cir. 5/31/19), 2019 WL 2315340, at *2, writ denied, 2019-01060 (La. 10/1/19), 280 So.3d 158. The **Jackson** standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the jury

---

[6] As the defendant notes, Clark informed the police that on the night in question, he saw someone wearing all black and having shoulder-length dreadlocks. However, contrary to the defendant's assertion in brief, there was no testimony that Clark identified that person as the shooter.

[7] We note that Harris responded positively when asked on redirect examination at trial if he had dreads or longer hair at the time of the offense.

reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Vaughn**, 2018-0344 (La. App. 1st Cir. 9/24/18), 259 So.3d 1048, 1058, judgment reversed in part on other grounds, 2018-01750 (La. 11/25/19), 283 So.3d 494.

Second degree murder is defined in pertinent part as "the killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). The State bears the burden to prove those elements, along with the burden to prove the identity of the defendant as the perpetrator. **State v. Coleman**, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155. When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. **State v. Dorsey**, 2010-0216 (La. 9/07/11), 74 So.3d 603, 634, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **State v. Lavy**, 2013-1025 (La.

6

App. 1st Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150.

After the defendant was developed as a suspect, Detective Cook made contact with the defendant at 1269 Christy Drive, on May 14, 2014, acquired the defendant's Nokia cell phone, and obtained a search warrant for the defendant's cell phone. However, the High-Tech Crimes Department was unable to access the data on the phone due to the undetermined passcode, and the phone contained a sim card for a phone number that was inconsistent with the incriminating communications at issue with Harris. As a result, Detective Cook obtained a search warrant for the AT&T records associated with the phone number, 225-620-7129. The cell phone company informed Detective Cook that the phone number at issue was a prepaid phone number through another smaller company, that subscriber information was unavailable, and only the incoming and outgoing phone call records were retrievable.

In addition to communicating with Harris, the phone number 225-620-7129 was frequently used to communicate with the phone number 225-573-6321, approximately forty-four times in a window of the three days preceding the murder. Detective Cook ascertained that the latter phone number belonged to Brittany Robinson (the defendant's girlfriend), whom the detective interviewed twice in the month of July of 2014. While she was not forthcoming in the initial interview, based on information provided during the second interview, Detective Cook obtained a warrant for the defendant's arrest. After the warrant was executed, Detective Cook obtained a DNA sample from the defendant. Detective Cook further testified that Robinson verified that the defendant was known as "Mond." Detective Cook also testified that the defendant was the only "Mond" that came up in his investigation of

7

this case and could not recall if another witness, Letitia Brothers, had told him there were at least three different persons known as "Mond" in the area.[8]

Robinson, the defendant's girlfriend, testified at trial. She confirmed that she referred to the defendant as "Mond" as did the defendant's sister and his friends. Robinson explained that at the time of the initial police interview, she did not have any relevant information but had acquired information by the time the second interview took place. She admitted that she informed the police that the defendant was using the phone number 225-620-7129 in April and May of 2014, adding that she guessed he was using the number "around that time." After being allowed to refresh her memory with her statements at the time of the second interview, she confirmed that the defendant was using that phone number during the months at issue. According to Robinson, the defendant changed his number three times between January of 2014 and July of 2014 and was no longer using the number at issue at the time of the police interviews in July.

Robinson further confirmed that the defendant asked her to purchase .38 caliber bullets in 2014, months prior to her police interviews in July 2014. She confirmed that she purchased the bullets and gave them to the defendant. In addition to providing the statements, Robinson identified the defendant in a photographic lineup and again in court at trial. On cross-examination, she denied ever seeing the defendant with a weapon. She further confirmed that the defendant had an acquaintance, Raymond Veal, who also used the name "Mond" as did her "god-brother's cousin," Jamond Rougeau.

---

[8] As previously mentioned, on cross-examination, Detective Cook confirmed that Jarvis Clark provided a description of who he saw at the scene of the shooting; specifically, someone wearing all black with shoulder-length dreadlocks. However, on redirect examination, Detective Cook confirmed that Clark did not see the shooting and only saw multiple individuals in the parking lot after the shooting.

Harris, who was incarcerated at the time of the trial, testified that he had known both the defendant and the victim since childhood. Harris identified the defendant in court and confirmed that he referred to the victim as B.T. Harris confirmed that while he was with the victim on the day of his murder, he was communicating with someone to coordinate the victim's murder and identified that person as "Mond." He further confirmed that the communications were by text message, admitted to causing the victim's murder, and identified a photograph of the victim in court. Harris specifically confirmed that the "Mond" with whom he communicated to coordinate the victim's murder did in fact shoot the victim. He agreed that the person who killed the victim was wearing all black with a hood that night. However, when asked at trial to identify the defendant as the person, Harris denied that "Mond" was the defendant and stated that he did not know the full name associated with "Mond." Harris confirmed that he previously pled guilty to manslaughter in connection with the victim's murder and that he had agreed to tell the truth. The transcript of Harris's guilty plea proceeding was also admitted into evidence at trial. Therein, the factual basis presented at that time of Harris's plea indicated that the State would prove the following:

> [O]n or about May 1st of 2014[,] Mr. Harris was present at the scene where Elbert Marshall was murdered by Demond Bessie. Demond Bessie being the shooter. Mr. Harris did directly procure and counsel, aiding and abetting in the preparation even, of that homicide, Judge. That being evidenced through recovered text message, cell phone data directly recovered on Mr. Harris's person that did evidence that specific intent to kill.

The guilty plea transcript further shows that when Harris was asked if he was in fact guilty of the manslaughter offense as stated in the above factual basis, he replied, "Yes, sir."

After being shown the transcript of his guilty plea, Harris confirmed that the transcript stated that he procured and counseled the defendant, Mr. Demond Bessie, to shoot and kill the victim, Bertrand Marshall. Harris then maintained that he

"never said nothing about Demond Bessie. Y'all said that." However, he again admitted that the "Mond" that he was texting the night that the victim was murdered was the "Mond" that shot and killed the victim.

Detective Hunt extracted and gave detailed testimony regarding the text messages and phone logs between the cell phones at issue in this case. A text message sent to a number labeled "Ticia" from Harris's phone at 11:58 p.m., on April 29, 2014, two nights before the victim's murder, stated as follows, "Shooting dice waiting on BT I'm bout to see how mond living he loaded talking about he ready to smash BT .... I tryna set the shit up[.]" Three minutes later, on April 30, 2014, at 12:01 a.m., the following outgoing message was sent from Harris's phone to a number labeled as "Slim", "N**** bout to put dat iron on BT get him out my way then I'm cum just leave the door open[.]"

On April 30, 2014, between 12:25 a.m. and 12:31 a.m., there were seven phone calls between Harris and the phone number identified as belonging to the defendant, labeled "Mond." Later that day, at 4:50 p.m., a text message from "Mond" to Harris stated, "I jux shook bk I got my girl going get some 38 bullets na ..... we can f*** wit it 2night no dought .... I wuz trippn last night any way I wuz2 loaded I wounted 2 jux f*** over dat b**** right quick ..... But I'm f***n wit DAT 2night out gate[.]" During the twenty-four hour period prior to the killing (from the night of April 30, 2014 to the early morning hours of May 1, 2014), Harris and "Mond" continued to communicate by phone, including phone calls and text messages with location updates and instructions. Specifically, as detailed in Detective Hunt's report and testimony at trial, the following deleted exchanges took place:

> Entry 41; 5/1/14 12:56:59 AM ... ; To: +12256207129 Mond; "Don't go to sleep son"

> Entry 38; 5/1/14 1:02:50 AM ... ; From: +12256207129 Mond; "Im good I slept all day"

Entry 37; 5/1/14 1:13:46 AM … ; To: +12256207129 Mond; "I we back here now son......"

Entry 36; 5/1/14 1:13:57 AM … ; To: +12256207129 Mond; "New Port"

Entry 34; 5/1/14 1:16:12 AM … ; From: +12256207129 Mond; "U dropping that n**** off????"

Entry 33; 5/1/14 1:16:50 AM … ; To: +12256207129 Mond; "Wait tell we walking to da car no he still here….. cum on"

Entry 32; 5/1/14 1:21:31 AM … ; From: +12256207129 Mond; "Wya n [Where you at in] new port"

Entry 31; 5/1/14 1:22:01 AM … ; To: +12256207129 Mond; "La Anna"

Entry 26; 5/1/14 1:23:23 AM … ; To: +12256207129 Mond; "Cumn from up there its da 2nd drive way ….. it's dat bac drive way then it's the next 1"

Entry 25; 5/1/14 1:23:44 AM … ; From: +12256207129 Mond; "Wat y'all n??"

Entry 24; 5/1/14 1:25:00 AM … ; To: +12256207129 Mond; "Lil hatch back new car .... it's pulled straight back"

Entry 23; 5/1/14 1:26:38 AM … ; From: +12256207129 Mond; "I gotta kno where sun ….cuz I'm bout 2 leave my phn…so tell me where exactly"

Entry 22; 5/1/14 1:29:07 AM … ; From: +12256207129 Mond; "Tha 2nd drive way come up in LA Anna"

Entry 21; 5/1/14 1:30:19 AM … ; To: +12256207129 Mond; "Yea da car pulled all the way to the window"
Entry 20; 5/1/14 1:30:23 AM … ; To: +12256207129 Mond; "Cum on"

Entry 17; 5/1/14 1:32:45 AM … ; To: +12256207129 Mond; "Hurry up cuz I think we bout to go"

Defense witness Leticia Brothers testified that she knew three "Monds" in the area and confirmed informing Detective Cook as such. On cross-examination she confirmed that Harris fathered some of her children and that she also knew the defendant, as he is the brother of the father of her other children. She further

confirmed that she might have posted on her Facebook page that she wanted the defendant and Harris to be free.

Herein, the jury heard the testimony of all the witnesses. The phone communications admitted at trial showed that Harris was conspiring with someone whose phone number was labeled as "Mond" to shoot and kill the victim. Robinson confirmed that the phone number belonged to the defendant, that the defendant was known as "Mond," and that she, around the time of the shooting and at the defendant's request, purchased the caliber bullets that were later determined to be consistent with the bullets used to kill the victim, and she gave them to the defendant. The text messages and testimony of Robinson, which was corroborated by the phone records, were accepted by the jury. During his guilty plea, Harris agreed with the factual basis specifically indicating the defendant was the shooter with whom he conspired. The jury apparently rejected the hypothesis that the murder was committed by a different person referred to as "Mond." See **State v. Brothers,** 2017-0870 (La. App. 1st Cir. 11/1/17), 233 So.3d 110, 116, writ denied, 2017-2160 (La. 10/8/18), 253 So.3d 803 (finding the evidence sufficient to support the second degree murder conviction, despite key witnesses recanting their statements at trial, because the witnesses' original statements positively identified the defendant as the shooter). In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See **Ordodi,** 946 So.2d at 662. Considering the evidence presented at trial, the jury could have rationally concluded that the defendant was the shooter in this case.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway,** 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond

12

the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder, and the defendant's identity as the perpetrator. Thus, assignment of error number one lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In assignment of error number two, the defendant argues that improper statements by the prosecutor during closing arguments warrant a new trial. He specifically contends that the State, in violation of a previous ruling by the trial court that excluded such testimony, mentioned during its closing that Clark told Detective Cook he was intoxicated on the evening of the murder. The defendant further contends the State improperly told the jury that subpoena returns indicate that the Sheriff's Office attempted to serve Clark but was unable to locate him. In that regard, the defendant notes that no subpoena was introduced into the record showing such an attempt. He also notes that the State spoke to Clark a week before the trial, knew his whereabouts, and took no documented action to acquire his appearance at trial. The defendant adds, "We submit that the State wasn't interested in having his [Clark's] testimony because it would further expose the weakness in their case against Mr. Bessie." In response, the State, in part, notes the defendant did not object to these statements.

Closing statement arguments shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the State or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to

13

prejudice. La. Code Crim. P. art. 774. Although they should not misstate the evidence, prosecutors are allowed wide latitude in choosing closing argument tactics. See **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 614, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). The trial court has broad discretion in controlling the scope of closing arguments, and this court will not reverse a conviction on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. **State v. Jones**, 2018-0085 (La. App. 1st Cir. 11/5/18), 2018 WL 5785450, at *10, writ denied, 2018-1993 (La. 4/22/19), 268 So.3d 294; **State v. Vansant**, 2014-1705 (La. App. 1st Cir. 4/24/15), 170 So.3d 1059, 1063. Pursuant to La. Code Crim. P. art. 851(B)(5), a new trial shall be granted whenever the court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right. The ruling on a motion for new trial is committed to the sound discretion of the trial court and will be disturbed on appeal only when there is a clear showing of an abuse of that discretion. **Jones**, 2018 WL 5785450, at *19.

In the instant case, as the defendant notes, during closing remarks, the State, in pertinent part, stated,

> Mr. Jarvis Clark. Testimony came from Detective Cook about his interview with Jarvis Clark. Jarvis Clark came upon the scene after the shooting had occurred. He heard the gunshots but he did not see the shooting. He said there were multiple individuals out there after the shooting and he told Detective Cook that he was intoxicated that evening. He did mention that someone was out there with dreads.

As the State notes in its appellate brief, there was no objection to these statements or any other portion of the State's closing.[9] However, the defendant raised the issue in his motion for new trial.

---

[9] As the defendant notes, during redirect examination at trial, the trial court sustained the defendant's hearsay objection when the State asked Detective Cook if Clark indicated that he was intoxicated on the evening of the shooting.

Absent any objection, the defendant is deemed to have waived any such error and is precluded from raising the issue on appeal. See La. Code Crim. P. art. 841(A). Despite the lack of an objection, extremely prejudicial and inflammatory remarks require reversal. See **State v. Hayes**, 364 So.2d 923, 926-27 (La. 1978); **Jones**, 2018 WL 5785450, at *11. However, in this case our review of those portions of the prosecutor's closing argument at issue convinces us that the remarks were not so prejudicial or inflammatory as to require reversal. As the trial court noted in denying the defendant's motion for new trial, prior to the opening remarks and again before deliberations, the trial court instructed the jury that the opening and closing arguments and statements by attorneys are not evidence. The trial court further reminded the jury that it may not consider evidence that it was instructed to disregard or to which an objection was sustained. Much credit should be accorded to the good sense and fairmindedness of jurors who have seen the evidence and heard the argument and have been instructed by the trial court that arguments of counsel are not evidence. **Vansant**, 170 So.3d at 1065. We do not find that the prosecutor's remarks at issue contributed to the verdict or made it impossible for the defendant to obtain a fair trial. See La. Code Crim. P. art. 775; **Vansant**, 170 So.3d at 1064. Accordingly, we find no merit in assignment of error number two.

**CONVICTION AND SENTENCE AFFIRMED.**