NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-149

STATE OF LOUISIANA

VERSUS

DETRIAVION D. GREEN

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 351,275
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ELIZABETH A. PICKETT
CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Sharon Darville Wilson, and Guy E. Bradberry, Judges.

CONVICTIONS AND SENTENCES VACATED;
JUDGMENTS OF ACQUITTAL ENTERED.

Annette Fuller Roach
Louisiana Appellate Project
P. O. Box 6547
Lake Charles, LA 70606-6547
(337) 436-2900
COUNSEL FOR DEFENDANT-APPELLANT:
    Detriavion D. Green

**J. Phillip Terrell, Jr.**
**District Attorney, Ninth Judicial District**
**Kelvin G. Sanders**
**Assistant District Attorney**
**P. O. Box 7358**
**Alexandria, La 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**PICKETT, Chief Judge.**

## FACTS

Detriavion Green, the defendant, was charged by bill of indictment with the second degree murder of Shemar Nash, in violation of La.R.S. 14:30.1, and the attempted second degree murder of Day'lon Patterson, in violation of La.R.S. 14:27 and 30.1. The defendant was found guilty as charged by a unanimous jury verdict. The trial court sentenced the defendant to life imprisonment at hard labor without parole, probation, or suspension of sentence for second degree murder and sixteen years for attempted second degree murder, to run concurrently. He is before this court appealing his convictions.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENTS OF ERROR

1) The evidence was insufficient to prove beyond a reasonable doubt the identity of the person who shot and killed Shemar Nash and shot in the direction of Day'Lon Patterson.

2) When viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, the evidence was insufficient to prove beyond a reasonable doubt that Detriavion Green either killed Shemar Nash or participated in an armed robbery during which Shemar Nash was killed.

3) When viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, the evidence was insufficient to prove beyond a reasonable doubt that Detriavion Green attempted to commit second degree murder of Day'Lon Patterson.

4) Defense counsel rendered assistance below that required by the Sixth Amendment when he failed to request a "great caution" charge, failed to object to the trial court's failure to give a "great

caution" charge, and failed to object to the court's definition of attempted second degree murder, which erroneously included a felony-murder alternative. Additionally, attempted second degree murder required a finding that Green specifically intended to kill Day'lon Patterson. Thus, the court's instruction that a guilty verdict could be returned if the jurors concluded that the offender was engaged in the perpetration or attempted perpetration of armed robbery even though he had no intent to kill was a misstatement of the law. Counsel's failure to object to both the insufficient and incorrect jury instructions given by the court deprived Detriavion Green of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the Louisiana Constitution and resulted in prejudice to Detriavion Green.

5) The trial court erred in failing to properly advise Detriavion Green that the time frame within which he had to file an application for post-conviction relief did not begin to run until his judgment of conviction was final.

## ASSIGNMENTS OF ERROR ONE, TWO, AND THREE

In these combined assignments of error, the defendant raises several challenges to the sufficiency of the evidence presented by the state. We will first discuss the evidence presented at trial then discuss the specific challenges raised by the defendant.

*Trial Transcript and Joint Exhibit*

Angie Branton, director of the Rapides 911 Center, testified that they received a call on January 6, 2021, at approximately 23:06 hours from Trent Roberson of 2404 Detroit Street reporting that his friend had been shot in the head.

The case was assigned to Alexandria Police Detective Tod Beaman, who arrived on the scene after patrol officers had secured it. Upon arrival, he saw a deceased male, Nash, next to the stairs leading to the side entrance of the house. It appeared that Nash had been shot in the face with an exit wound on the back of his head. Roberson, the only person present at the scene, was brought to the station

for questioning. Detective Beaman interviewed Roberson and searched his cell phone after obtaining consent. He saw that immediately prior to the 911 call, a contact labeled "Yay-O head hunter" had called Roberson. This individual was identified as Marckeeyse Dorsey (Dorsey), a name familiar to Detective Beaman from previous cases he had worked, including the robbery of "an AR-15 style rifle that was chambered in 762 by 51 which is a very large caliber."

The communication between Roberson and Dorsey prompted a second interview with Roberson a short time later. He confirmed that Dorsey was at his residence that night. Detective Beaman also conducted a search of Nash's phone, and he found photographs of a rifle matching the rifle previously described, the one taken in a previous robbery. The label on the photograph, "762 2000 or better," indicated "they" were trying to sell the rifle. Anonymous tips led to others who may have been present that night.

In the course of investigation, Detective Beaman learned there were others present at Roberson's house that night, including Eric Tison, Jimique Tison, and Day'Lon Patterson (Patterson). Roberson confirmed this information. According to Detective Beaman, two people were interviewed, and their stories corroborated each other. As for physical evidence, Detective Beaman testified that the police received a jacket from Patterson. The jacket had a hole suspected to have been made from a bullet entry and exit and burn marks consistent with a gunshot at close range. Detective Beaman testified that they interviewed Roberson a total of three times, and the information they received was consistent with other information uncovered in the investigation.

Alexandria Police Sergeant Chris Fonville photographed the scene and collected evidence from Roberson's house. In the yard, he identified what he

suspected to be a piece of the victim's skull twenty-seven feet away from the victim's body. While searching the bedroom, he discovered two bags of marijuana under the dresser. Inside a drawer, he found an empty Glock "9 millimeter magazine and an unfired 7562 cartridge," later described as a "762 by 39 cartridge." During the investigation, law enforcement also recovered two cell phones, one of which was a Samsung Android belonging to the victim Nash.

Sergeant Fonville testified that he attended Nash's autopsy, and he took a photograph of Nash showing the entry wound which was "[a]pproximately a centimeter by one centimeter." On cross-examination, Sergeant Fonville confirmed that neither the murder weapon nor any spent shell casings were located at the scene.

Roberson, the occupant of the home where the shooting occurred, testified that on January 6, 2021, he was living in the home with his mother and his little brother. That night, around 11:00 p.m., Dorsey, Nash, and Trey (the defendant) were also present at the house. While they were there, other people showed up as well, but Roberson testified he did not know any of them, including Patterson. He testified that he was inside the house and thus unaware of how many other individuals showed up that night.

Roberson was first shown his January 14, 2021 statement made to Sergeants "Bowman [sic]" and Butler, the content of which he claimed was forced by Sergeant Butler. He testified that he did not make the statement that Dorsey and Patterson were at his house. Roberson acknowledged that he was arrested for armed robbery relating to this case and that he entered a plea to robbery of Eric Tison and Jimique Tison, which he said was also forced due to threats. At the time

4

of trial, he was serving time for the robbery, but his case was complete. Roberson was an uncooperative witness, at times invoking the Fifth Amendment.

After Roberson's testimony, the state recalled Detective Beaman as a witness. He explained that after the initial interview of Roberson was conducted, the detectives stepped out to review information and then interviewed Roberson a second time. One week later, after gaining more information, Roberson was interviewed a third time. All three interviews were recorded. Detective Beaman testified that Roberson was advised of his rights, and Detective Beaman identified the advice of rights forms signed by Roberson on January 7, 2021, and January 14, 2021. Detective Beaman testified that the defendant was not forced to sign either form.

Prior to the interviews being played for the jury, Detective Beaman explained that their procedure is typically to record the entire interview, but after the interview, they often digitally record "another question and answer deal" to be more concise for transcription. Usually, the entire video interview is not transcribed due to its length. The jurors were provided with the transcribed portion of Roberson's statements for their viewing during the playing of his interviews.

Detective Beaman testified that during the third and final interview, Roberson disclosed that the defendant was at the house in addition to Dorsey, Nash, Patterson, and two brothers, whom he described as being tall. Patterson was at the house to buy narcotics. After the drug transaction was completed, Roberson turned back to walk to his room, and he heard a shot. Upon hearing the shot, he went to the side door of the house where he saw that Nash had been shot. Dorsey was in the house during this time, and he retrieved a gun. After hearing the shot, Roberson did not see the defendant again. Roberson saw Dorsey after the shooting,

but everyone else fled. Roberson, in his statements, said he had nothing to do with the planning or execution of the robbery. From Roberson's statements, Detective Beaman did not know of the defendant's involvement in the robbery. From what Roberson indicated, Dorsey and Nash planned the robbery. In Roberson's second statement, he acknowledged that Dorsey was there, and, in the third statement, he provided the other names. According to Detective Beaman, at the time of the shooting, Roberson's statement placed Dorsey inside the house and Nash and the defendant outside. Detective Beaman testified that Patterson was deceased at the time of trial, as was Eric Tison, both of whom had been present at Roberson's house that night. Their deaths were unrelated to this case.

As joint exhibits, the court minutes and guilty pleas from Roberson's and Dorsey's proceedings were entered into the record. A review of the documents contained therein revealed that Roberson and Dorsey were jointly charged with the January 6, 2021 armed robbery of Eric Tison and Jimique Tison. Plea forms and court minutes dated April 25, 2022, indicated that Roberson pled guilty to first degree robbery and was sentenced to serve five years at hard labor without the benefit of parole, probation, or suspension of sentence. Dorsey also pled guilty to first degree robbery and was sentenced to serve five years at hard labor.

_Roberson's Three Recorded Interviews_

In Roberson's first statement, he said that he and Nash were at his house watching a basketball game and smoking weed. Nash received a phone call and went outside to talk to someone. About five to seven minutes after Nash went outside, Roberson heard a shot. He ran outside, found Nash lying on the side of the steps, and he called police. Roberson's cousins Antony and Devante had been at the house earlier, but they left a few hours before the shooting occurred. During

6

the course of the interview, police told Roberson that "people on the street" said Nash had gotten into a fight several weeks prior, and they asked Roberson if he knew anything about it. He said, "[y]eah, at my house, it was him and my cousin. They was high off of, you know . . . ecstasy pills." Roberson identified his cousin as Marckeeyse Kirklin (Dorsey). Roberson said that he and Dorsey did not really get along, and he did not hang out at Roberson's house. In fact, they had "got[ten] into it" the same night that Dorsey and Nash did. When he was asked to explain, Roberson said that he thought somebody tried to steal some weed and "a few little dollars" from Dorsey, and Dorsey suspected that Roberson and Nash had something to do with it. According to Roberson, Dorsey was "on Xanax and just tripping." He said he did not think Dorsey could have "done this."

In Roberson's second interview, he said he, Dorsey, and Nash were at his house watching a game. Dorsey was on the phone talking to someone "about pulling up." When asked what Dorsey's intentions were, Roberson said, "I gu- - - - they was trying to (inaudible) rob somebody[.]" When asked who "they" were, he said "Yao [Dorsey] and Shemar [Nash]." He said Dorsey was talking, and Nash "just tagged along." He believed that Dorsey was selling weed and that he was going to try to take their[1] money. Dorsey and Nash went outside, and Roberson believed both were armed. Dorsey had a black rifle with a handle on one end, and Nash had a black pistol. About ten to fifteen minutes later, someone pulled up at Roberson's house. Approximately five minutes later, Roberson heard a shot, went outside, and found Nash lying on the side of the steps. Dorsey was no longer there, and Roberson could not tell whether Nash still had his gun on him. Approximately

---

[1] Roberson did not say who "they" were.

7

two to three minutes later, Dorsey called Roberson asking, "is [Nash] okay (inaudible) is did he get shot anything." According to Roberson, Dorsey did not return to the scene.

In the untranscribed portion of this interview, Roberson described the gun that Dorsey had as long and having a handle on the front, agreeing it was probably an AR-15. In speaking about a prior incident, Roberson said Dorsey "snaps easy" and had shot at him the previous November during an argument.

The third and final interview was conducted one week later, after law enforcement obtained additional information. In this interview, Roberson said that he, Nash, Dorsey, and his cousin, Trey[2] (the defendant), were at his house. It is unclear whether the defendant was outside the whole time or whether he was inside watching the game with the others at some point. In this statement, Roberson initially said Trey (the defendant) was "outside or whatever uhm we was all watching the game Shemar [Nash] had got a call he stepped outside (inaudible) Uhm Yao [Dorsey] invited someone . . . there was a transaction." Nash received a phone call and stepped outside. A person named Patterson came in through the side door which led into the kitchen. Roberson said Patterson, Dorsey, and two other guys were in the kitchen. Roberson said he stood "mid in the hallway near . . . the bathroom and the kitchen like it's all like in one lil small lil gap." He said he could not see into the kitchen because the "two guys," whom he believed to be the buyers, were tall. However, Roberson could see Dorsey and Patterson. After the transaction was completed, Roberson walked off and "they" opened the door and he heard a "pow." "Everybody scattering and I see Yao [Dorsey] run back in the

---

[2] In the untranscribed portion of the recording, Roberson described Dorsey as his "blood cousin" but said he did not know the defendant was his cousin.

house grab a gun[,]" which he believed was a rifle. When Roberson walked outside, he saw Nash lying on the ground, and he called police. Roberson denied seeing the defendant after the shooting. When asked if the defendant was outside with Nash, Roberson confirmed that they were both outside the house. He again confirmed that while Patterson and the other two guys he did not know were inside the house with Dorsey, Nash and the defendant were outside. After he heard the gunshot, he did not see the defendant. Roberson was asked if Dorsey said anything to him after the shooting, and he said he called "to confirm if [sic]." According to Roberson, Patterson and the other two guys "took off." Although Roberson assumed a vehicle may have been there because everyone vanished quickly, he did not see or hear one.

When Roberson was asked whether he said in his first statement that the reason for the people coming to his house for the drug transaction was because Dorsey was going to rob them, he replied, "Uhm I believe so but I don't know." Roberson confirmed that police showed him a lineup, and he identified the defendant as being the fourth person who was at his house that night.

After viewing the untranscribed portion of Roberson's statement, we note Roberson said Nash went outside and was talking. Dorsey and the defendant left his room, and Roberson stayed in his room watching the game. He then heard a bang and "Yay O [Dorsey] running." He later added that Dorsey was running, "getting everything." Roberson admitted to leaving the defendant out of his prior statements but added that he did not know what the defendant had to do with it. He also said he did not think that the defendant had anything to do with it. Roberson admitted to seeing the drug transaction in the kitchen, adding that the defendant did not sell. He indicated he believed the defendant was outside with

9

Nash during the drug transaction. Roberson said a total of three people came to buy weed, Patterson and two tall guys, but he denied knowing Patterson.[3]

Roberson said he did not want police to think Dorsey shot Nash because the two were friends, and he did not think Dorsey did it. The officers told Roberson they were ninety-five percent sure Dorsey did not shoot Nash, and Roberson responded, "cool." When police asked Roberson where the guns went, he said that Dorsey picked one up from the couch and ran outside with it. Roberson did not see the defendant with a gun. He did not see the defendant but believed he ran from the scene with Dorsey. When police asked him for the defendant's contact number, Roberson said the defendant was a friend of Nash and Dorsey and he did not have a phone number for him.

Louisiana Revised Statutes 14:30.1 defines second degree murder in pertinent part as follows:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

Attempt is defined in La.R.S. 14:27 in pertinent part as:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the

---

[3] Although it is not clear, at one point in the interview, Roberson said that after the transaction was done, before Patterson walked out, a guy came in the house. Dorsey let him in and gave him the weed. At other points, Roberson made it sound as if no more than three buyers came to the house, Patterson and the two tall guys.

accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

Specific intent to kill is required for a conviction of attempted second degree murder:

It is well settled in Louisiana jurisprudence that the crime of attempted second degree murder cannot be based upon an underlying felony. *State v. Guccione*, 96-1049, p. 17 (La.App. 5[] Cir. 4/29/97), 694 So.2d 1060, 1068, *writ denied*, 97-2151 (La. 3/13/98), 712 So.2d 869. An attempt to commit second degree murder requires that the offender possess the specific intent to kill and commit an overt act tending toward the accomplishment of that goal. LSA-R.S. 14:27(A); 14:30.1(A)(1). This is inconsistent with the felony-murder theory of an unintentional killing as provided in LSA-R.S. 14:30.1(A)(2)(a).

*State v. Graham*, 02-1492, p. 7 (La.App. 1 Cir. 2/14/03), 845 So.2d 416, 421; *see*

*also State v. Gay*, 36,357, 36,358 (La.App. 2 Cir. 10/23/02), 830 So.2d 356.

The standard of review when the sufficiency of the evidence is challenged

on appeal is as follows:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel.*

*Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. It is the factfinder's role to weigh the respective credibility of the witnesses, and the reviewing court will not second-guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson*, 425 So.2d 1228 (La.1983). The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied*, 15-1151 (La. 5/13/16), 191 So.3d 1054.

A conviction based on insufficient evidence cannot stand as it violates Due Process. *See* U.S. Const. amend. XIV; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in *Jackson*, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. *See* La. Code Crim. P. art. 821(B); *State v. Ordodi*, 06-207 (La. 11/29/06), 946 So.2d 654, 660. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. La.R.S. 15:438; *State v. Wright*, 98-0601 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 486, *writs denied*, 99-0802 (La. 10/29/99), 748 So.2d 1157, 00-0895 (La. 11/17/00), 773 So.2d 732. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. *State v. Captville*, 448 So.2d 676, 680 (La. 1984).

*State v. Coleman*, 17-1045, p. 6 (La.App. 1 Cir. 4/13/18), 249 So. 3d 872, 877, *writ denied*, 18-830 (La. 2/18/19), 263 So.3d 1155.

*State v. Simmons*, 23-661, pp. 2–3 (La.App. 3 Cir. 3/20/24), 381 So.3d 1033, 1036–37.

The defendant raises several claims regarding the insufficiency of the evidence presented by the state to support his conviction. First, he contends the state failed to show that he was either the person who fired the fatal shot or that he participated in an armed robbery during which Nash was shot. Additionally, the defendant contends the state failed to prove that he attempted to shoot Patterson or that he had the intent to kill him. The defendant notes that the only person placing him in the vicinity of the shooting was Roberson, who was impeached at trial due to his various inconsistent statements and his trial testimony that his prior interviews were not truthful. Even if the jury found Roberson's statements truthful, the defendant contends that they were still insufficient to establish that a robbery was taking place at the time of the shooting or that the defendant was still present at the time of the shooting and purported robbery. Because there was no corroboration of Roberson's testimony or physical evidence connecting the defendant to the shooting or placing him in possession of a weapon, he contends that his identity as either the shooter or a principal was not proven beyond a reasonable doubt.

Next, the defendant contends that no physical evidence connected him to the shooting as the only evidence linking him to the killing was his presence at the residence minutes prior to the shooting. Additionally, he contends that there was no evidence establishing that a robbery of Patterson occurred, that there was a plan to rob anyone, or even if there was a plan, that he was a part of the discussion. The defendant contends that the fact he left the residence prior to the shooting was not enough to establish his involvement or his awareness that Nash had been shot. He notes that Roberson placed both Nash and Doyle (presumably Dorsey) outside at the time of the shooting.

Finally, the defendant contends that the evidence presented at trial was insufficient to prove that he had the specific intent to kill Patterson, as required for a conviction of attempted second degree murder, or that he did an act in furtherance of this objective. He notes that the state incorrectly informed the jury that it did not matter whether the shooting of Patterson was an accidental discharge of the weapon when the robber stumbled or if it occurred with an intent to either kill or inflict great bodily harm on Patterson.

In opposition, the state contends that the jury accepted Roberson's testimony and recorded statements, which established that there was a plan to rob individuals who came to the house to buy marijuana, that there was at least one weapon (a rifle) at the house at the time of the offense, that only the defendant, Patterson, and Nash were outside of the house at the time of the shooting, and that the defendant left after the shooting. This, the state argues, is strong circumstantial evidence of the defendant's involvement in the robbery plan, and it proved that he fired a shot that passed through Patterson's jacket and killed Nash.

The state contends that a reasonable jury could infer that the defendant attempted to take something of value (either drugs or money) from Patterson, that it was in his immediate control, that the defendant used force or intimidation by pointing a gun at Patterson, and that he was armed with a dangerous weapon, as evidenced by the bullet hole in Patterson's jacket. Additionally, the state argues that the jury could also infer that he missed Patterson and struck Nash, even though Nash was not the intended target of the bullet. Additionally, the state argues that a reasonable jury could infer that the defendant's flight after the murder indicated consciousness of guilt.

14

Even assuming all of the facts provided in Roberson's third statement (the only statement in which he acknowledged the defendant's presence at the house that night) were accepted as true by the jury, there was nothing establishing that the defendant was part of the planning or was aware of Dorsey (whom Roberson described as "talking" and Nash as following along) and Nash's plan to carry out a robbery. There was no evidence that the defendant was armed that night. Although there was no expert testimony presented regarding the injuries, law enforcement believed a high-powered weapon was used in the shooting as evidenced by a piece of Nash's skull being found twenty-seven feet away from his body. The only testimony regarding a high-powered weapon was about a gun belonging to Dorsey. While it appears that gun may not have always remained in Dorsey's control and may have been accessible to others, it appears from Roberson's statement that Dorsey came into the house after the shooting to get his rifle. ("Everybody scattering, and I see Yao [Dorsey] run back in the house grab a gun.") which Roberson believed was a rifle. This implies that the rifle was not in the defendant's possession at the time of the shooting. The only other weapon referenced was a pistol, which Nash had, according to Roberson.

One hypothesis of innocence advanced by the defense at trial was that Dorsey was the shooter. Nash and Dorsey had gotten into an altercation the prior week. Roberson's second statement placed Dorsey outside with a gun at the time of the shooting, and then one week later, he said that Dorsey was inside with no gun. Another hypothesis of innocence advanced by the defense at trial was that Nash and Patterson may have simultaneously fired at each other. The state's rebuttal was that in that situation, Patterson would have had to possess a long gun (rifle), and the state questioned how he would have hidden it.

15

The jury obviously chose to believe that Dorsey was inside at the time of the shooting and that the defendant and Nash were outside. After the transaction was complete and the buyers were leaving, Patterson was shot at, and Nash was hit in the head, presumably by a high-powered rifle. The defendant had earlier been inside the house, but he went outside at some point before the buyers arrived. Roberson saw Dorsey after the shooting but not the defendant. He believed/assumed that the defendant left with Dorsey. It is possible the defendant left the scene prior to the arrival of the buyers or that someone else may have approached the house while the buy was occurring. Roberson, the only witness on the scene, who pled guilty to first degree robbery, maintained that he was inside the house at all times prior to the shooting and that he never saw the defendant with a gun. The only thing tying the defendant to the shooting was the fact that he was outside of the house prior to the shooting. Additionally, Roberson and Dorsey pled guilty to first degree robbery of two victims bearing the last name Tison, presumably the two "tall guys" who accompanied Patterson to the house. Every reasonable hypothesis of innocence was not excluded in this case, especially given the internal inconsistencies in Roberson's statements, lack of an eyewitness to the shooting, and the lack of any physical evidence linking the defendant to the offenses. For these reasons, the state did not meet its burden of proving the defendant's guilt beyond a reasonable doubt. Accordingly, the defendant's convictions are reversed, an acquittal is hereby entered, and his sentences are vacated.

Assignments of Error Four and Five are rendered moot.

## CONCLUSION

The defendant's convictions for second degree murder and attempted second degree murder are vacated, a judgment of acquittal on both counts is hereby entered, and his sentences are vacated.

**CONVICTIONS AND SENTENCES VACATED;
JUDGMENTS OF ACQUITTAL ENTERED.**